# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4677 | **DATE** | July 9, 2002 |
| **CASE TITLE** | Brend, et al. v. SAMES Corp. and IL Tool Wks | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The parties' cross-motions [29,30] for summary judgment are denied. The case is set for status on July 31, 2002 at 11:00 to set a trial date. ENTER MEMORANDUM OPINION.

(11) [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| X | Notices MAILED by judge's staff. | | JUL 1 1 2002 | 38 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to _____ | | date mailed notice | |
| KAM | courtroom deputy's initials | | KAM | |
| | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
02 JUL 10 PM 5:13
FILED-FB-TO

Date/time received in central Clerk's Office
(Reserved for use by the Court)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICHARD T. BREND, EDWARD J.           )
BUJNOWSKI, JAMES DEL FAVERO,          )
STEPHEN R. KENNEDY, ERNEST J.         )
MAGNUS, LLOYD D. MCROY, HERBERT       )
H. OUGHTON, WILLIAM W. ROCHE,         )
RICHARD P. ROSSI, ERNEST F. WATTS,    )
STEVE TELCHUK, FRANK DOBIAS,          )
COSIMO DIGOVANNI, RALPH NEUMAN,       )
and KENT ANDERSON,                    )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )
                                      )   No. 00 C 4677
SAMES CORPORATION f/k/a BINKS         )
SAMES CORPORATION and f/k/a           )
BINKS MANUFACTURING CO., INC.,        )
a Delaware corporation, and           )
ILLINOIS TOOL WORKS, INC.,            )
a Delaware corporation,               )
                                      )
                Defendants.           )

**DOCKETED**

**JUL 1 1 2002**

## MEMORANDUM OPINION

Before the court are the parties' cross-motions for summary judgment. For the reasons explained below, the motions are denied.

## BACKGROUND

Plaintiffs are former highly compensated officers and managers who are retirees from defendant Sames Corporation ("Sames"), formerly known as Binks Sames Corporation and, before that, Binks Manufacturing Co., Inc. Each plaintiff entered into an Executive Retirement Income Contract (the "Executive Contract") with Binks

Manufacturing Co., Inc. at some time between 1980 to 1987. The Executive Contracts constitute "top hat" plans (discussed in detail infra), which are designed to provide deferred compensation and other retirement benefits to a select group of employees. In September 1998, Sames (at that time known as "Binks Sames") entered into an Agreement for the Purchase and Sale of Assets and Stock ("Purchase Agreement") with defendant Illinois Tool Works Inc. ("ITW").

The following relevant facts are taken from the parties' statements of undisputed material facts and exhibits attached to the briefs. Plaintiffs entered into the Executive Contracts with Binks Manufacturing Co., Inc.; ITW was not a party to any of these contracts. The Executive Contracts provide for retirement income, death benefits, and the eligibility to participate in life, health, and accident insurance. In addition, the Executive Contracts contain a non-compete clause prohibiting the employee from giving "assistance to a competitor," as defined therein, during the 10-year retirement period. (Defendant's Memorandum, Ex. 1, Exhibit to Amended Complaint, Executive Contract of Richard T. Brend, at 1, 4.) The Executive Contracts also provide that, "[i]f [Binks Manufacturing Company] shall at any time be merged or consolidated with any other corporation or if substantially all of the assets of the Company are transferred to another corporation," the Executive Contracts "shall be binding upon and inure to the benefit of the

successor corporation." (Id. at 6.) Sames established a "Rabbi
Trust" to provide a source of payment for the the Executive
Contracts.[1]

On September 30, 1998, Sames and ITW entered into the Purchase
Agreement. ITW purchased certain, but not all, of Sames's assets,
and assumed certain, but not all, of Sames's liabilities.
Essentially, ITW acquired the "Binks Assets"--assets related to the
"Binks Business"--which were defined in ¶ 1.2 of the Purchase
Agreement and Exhibit A thereto, and did not acquire the "Excluded
Assets," which were defined in the Purchase Agreement and primarily
consisted of assets related to the "Sames Business." ITW was aware
of the existence of the Executive Contracts at the time it entered
into the Purchase Agreement, and the Purchase Agreement
specifically provided that ITW was not assuming those contracts:

> As of the Closing Date, Purchaser shall assume
> sponsorship of all Foreign Benefit Plans relating to the
> Subsidiaries and all Employee Benefit Plans listed on
> Schedule 3.22 in which the [former employees of the Binks
> Business who accept employment with ITW] participate

---

[1] A "rabbi trust" is a type of grantor trust "in which an employer makes
contributions to the trust in the name of beneficiaries to create a source of
funding for otherwise unfunded benefit plans. Because the trust corpus
technically remains property of the employer, the beneficiaries of the trust are
not taxed on their portion of the Trust corpus or Trust proceeds until the assets
are actually distributed to the beneficiaries. As a condition for this tax
benefit, rabbi trusts are required to remain at all times subject to the claims
of the grantor's general creditors. Thus, once a grantor files for bankruptcy,
the rabbi trust corpus becomes property of the grantor's bankruptcy estate." In
re Outboard Marine Corp., 278 B.R. 778, 785 (N.D. Ill. 2002) (Aspen, J.)
(citations omitted). The name of the trust is derived from a "type of trust that
was established by the congregation of a synagogue to benefit its rabbi and
approved as tax-free by the Internal Revenue Service in a private letter ruling
in 1980." Id. at 785 n.6.

> except the Executive Retirement Income Contracts and the related Rabbi Trust . . . .

(Defendant's Memorandum, Ex. 3, Exhibit B to Affidavit of James H. Wooten, Jr., Purchase Agreement, ¶ 6.9.2 (emphasis added).) Paragraph 1.6 of the Purchase Agreement further provided that ITW would not assume any liabilities relating to the Binks Business except for those liabilities that were explicitly assumed in paragraph 1.5; the Executive Contracts were not listed in paragraph 1.5. (Id., ¶¶ 1.5, 1.6.) The fact that ITW did not assume the Executive Contracts had the effect of increasing the purchase price that ITW paid to Sames by approximately $4.8 million. Sames also retained the "Rabbi Trust."

Both prior to and subsequent to the sale, ITW was a publicly held company traded on the New York Stock Exchange with over 5700 shareholders and over 250,000,000 shares outstanding, and Sames was a publicly held corporation traded on the American Stock Exchange with approximately 2,964,835 shares outstanding. After the sale of the Binks Business, Sames and ITW each retained its own separate corporate existence, its own separate board of directors and officers, and each continued to be owned by its own separate group of shareholders. No Sames employee became an officer or director of ITW.

In July 2000, plaintiffs brought this action against Sames and ITW in the Circuit Court of Cook County, Illinois to enforce the Executive Contracts. Defendants then removed the action to this

court, asserting complete preemption by the Employee Retirement
Income Security Act of 1974 ("ERISA"), 18 U.S.C. § 1132 et seq.,
and the existence of federal question jurisdiction pursuant to 28
U.S.C. § 1331. The amended complaint alleges that Sames breached
the contracts by terminating plaintiffs' dental insurance plan,
increasing the percentage of medical insurance premiums that
plaintiffs were required to pay, and increasing premiums. The
amended complaint also seeks a declaration that ITW is liable to
plaintiffs under the Executive Contracts, on a theory of successor
liability. On August 17, 2001, Sames filed for liquidation
pursuant to Chapter 7 of the Bankruptcy Code.

Plaintiffs and ITW now cross-move for summary judgment.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). In considering such a motion, the court construes the
evidence and all inferences that reasonably can be drawn therefrom
in the light most favorable to the nonmoving party. See Pitasi v.
Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary
judgment should be denied if the dispute is 'genuine': 'if the
evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" Talanda v. KFC Nat'l Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## A. **Applicable Law**

As a threshold matter, we must determine what law applies to plaintiffs' claims. ITW argues that, "[w]hile this action technically arises under ERISA," we should "apply the well-settled common law of Illinois to resolve the dispute." (Defendant's Memorandum at 8.) This appears to be contrary to the position ITW took when it removed the action to this court: "The claims asserted relate to an employee benefit plan and are completely preempted by . . . ERISA." (Notice of Removal at 1.) It is clear why ITW wants us to apply Illinois law; the traditional common law rule "narrowly confine[s]" successorship liability. Upholsterers' Int'l Union Pension Fund v. Artistic Furniture, 920 F.2d 1323, 1326 (7th Cir. 1990); see also EEOC v. G-K-G Inc., 39 F.3d 740, 748 (7th Cir. 1994) (referring to "the more limited approach of the common law generally"). Under Illinois common law, "[t]he well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of

the transferor corporation." <u>Vernon v. Schuster</u>, 688 N.E.2d 1172, 1175 (Ill. 1997). "There are four exceptions to the general rule of successor corporate nonliability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." <u>Id.</u> at 1175-76.

Successor liability under federal common law, which plaintiffs urge us to apply, is broader. <u>Artistic Furniture</u>, 920 F.2d at 1326; <u>see also</u> <u>Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.</u>, 59 F.3d 48, 49 (7th Cir. 1995). "[I]n order to protect federal rights or effectuate federal policies, this theory allows lawsuits against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was 'substantial continuity in the operation of the business before and after the sale.'" <u>Chicago Truck Drivers</u>, 59 F.3d at 49.

According to ITW, the applicable law hinges on the nature of "top hat" plans. Top hat plans are a type of employee benefit plan for high-ranking employees and are exempted from ERISA's substantive provisions regarding participation, vesting, funding, and fiduciary responsibility. <u>See</u> <u>Fasco Indus. v. Mack</u>, 843 F.

Supp. 1252, 1255 (N.D. Ill. 1994). Congress believed that these employees have sufficient power to negotiate adequate plans for themselves and do not need the same protections as lower-level employees. See id. Nevertheless, top hat plans remain subject to the enforcement provisions of ERISA. ITW contends that Congress's exemption of "top hat" plans from many of ERISA's requirements "demonstrates a lack of federal interest that would compel this Court to displace well settled state common law of successor liability." (Defendant's Response/Reply at 9.)

We disagree. Although the Seventh Circuit has not addressed the issue with regard to top hat plans, it has held that the federal common law doctrine of successor liability pre-empts state law in actions seeking recovery under ERISA of delinquent multiemployer pension fund contributions. See Artistic Furniture, 920 F.2d at 1327; see also Moriarty v. Svec, 164 F.3d 323, 329 (7th Cir. 1998) ("'The federalization of multiemployer plan contribution obligations evinces a strong congressional desire to minimize contribution losses and the resulting burden such losses impose on other plan participants.' . . . [T]he state law of successor liability, which cuts off the obligation to pay a predecessor's promised contributions, significantly conflicts with this federal interest and justifies a departure." (citing Artistic Furniture, 920 F.2d at 1328)).

We agree with plaintiffs that the reasoning of <u>Artistic Furniture</u> and <u>Moriarty</u> for applying the federal common law of successor liability to multiemployer plan contribution actions applies with equal force to actions seeking enforcement of top hat plans. We follow the court's analysis in <u>Bigda v. Fischbach Corp.</u>, 898 F.Supp. 1004, 1015 (S.D.N.Y. 1995):

> It is clear that the provisions of the . . . enforcement section of ERISA apply to top hat plans. . . . Furthermore, the goals underlying ERISA's preemption of state laws indicate that <u>all</u> plans covered by ERISA should be protected by preemption. The purpose of preemption is to ensure that all covered benefit plans will be governed by unified law, thus making it simpler for employers operating in several states to administer plans because "[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation." There is no reason that top hat plans, unlike all other ERISA-covered plans, should be subject to a patchwork of different state laws.

<u>See also</u> <u>Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)</u>, 89 F.3d 143, 149 (3d Cir. 1996) ("Top hat plans are . . . governed by general principles of federal common law."); <u>Garratt v. Supplemental Executive Retirement Plan of Knowles Elecs., Inc.</u>, No. 01 C 4099, 2002 WL 23846, at *2 (N.D. Ill. Jan. 7, 2002) ("Federal common law developed under ERISA governs the enforcement of top hat plans."); <u>Koenig v. Waste Management, Inc.</u>, 76 F. Supp. 2d 908, 914 (N.D. Ill. 1999) (same). Accordingly, we will apply the federal common law rule of successor liability.

## B. **Successor Liability**

As set forth _supra_, under federal common law, a successor is liable for the predecessor's liabilities if (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale. See _Chicago Truck Drivers_, 59 F.3d at 49.

### 1. **Prior Notice**

ITW admits that it had notice of the liabilities under the Executive Contracts when it entered into the Purchase Agreement. (Answer, ¶ 10.) (Indeed, the Purchase Agreement expressly provided that ITW was not assuming liability for the Executive Contracts.) ITW's argument that it did not have notice of the claims because they were not "delinquencies" at the time of the Purchase Agreement is not persuasive. ITW cites no relevant authority for this narrow interpretation of the "prior notice" inquiry. The cases that ITW cites are distinguishable because they involved notice of potential employment discrimination lawsuits, not notice of existing contractual liabilities.[2] The Seventh Circuit has recognized that the concept of "notice" depends on the context. See _EEOC v. Vucitech_, 842 F.2d 936, 945 (7th Cir. 1988) ("There is, however, the following difference between the tort and labor contexts: in the latter, there is no question that the successor knows of any

---

[2]/ _Dybala v. Landau & Hayman, Inc._, No. 94 C 7719, 1997 WL 162846 (N.D. Ill. Mar. 27, 1997); _Wheeler v. Snyder Buick, Inc._, 794 F.2d 1228 (7th Cir. 1986) _Coleman v. Keebler Co._, 997 F. Supp. 1094 (N.D. Ind. 1998).

collective bargaining agreements that his predecessor has signed;
in the former, the successor may be ignorant of the predecessor's
liability. Employment discrimination, a tort in a labor context,
is thus a mixed case. Another mixed case is the successor's
liability for a predecessor's unfair labor practice; and here as we
would expect there must be a showing of notice to the successor.")
In this case, the necessary kind of notice is merely ITW's prior
knowledge of the plaintiffs' rights under the Executive Contracts,
and that prior knowledge is undisputed.

### 2. Substantial Continuity

The Supreme Court has held that successor liability depends on
whether there is a "substantial continuity" between the two
businesses, using a multi-factor analysis:

> This approach, which is primarily factual in nature and
> is based upon the totality of the circumstances of a
> given situation, requires that . . . the new company has
> "acquired substantial assets of its predecessor and
> continued, without interruption or substantial change,
> the predecessor's business operations." . . . Under this
> approach, the [court] examines a number of factors:
> whether the business of both employers is essentially the
> same; whether the employees of the new company are doing
> the same jobs in the same working conditions under the
> same supervisors; and whether the new entity has the same
> production process, produces the same products, and
> basically has the same body of customers.

Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43 (1987)
(citations omitted). We also consider whether the successor holds
itself out to the public as a continuation of the previous

enterprise. <u>See</u> <u>Central States, S.E. & S.W. Areas Pension Fund v.</u>
<u>Hayes</u>, 789 F. Supp. 1430, 1436 (N.D. Ill. 1992).

In addition to the Purchase Agreement, plaintiffs submit the
following evidence that bears on substantial continuity: (1) the
affidavits of plaintiffs Ernest F. Watts and William W. Roche; and
(2) a letter to shareholders dated October 2, 1998 from Binks
Sames' Chairman, Wayne F. Edwards, and its President, Arnold H.
Dratt, which described the sale to ITW ("the October Letter").
Watts and Roche both state that "the assets which were sold to ITW
by Sames constituted all or substantially all of the assets which
had been the assets of [Binks Manufacturing Co., Inc.] at the time
the Executive Retirement Income Contracts were entered into between
[Binks Manufacturing Co., Inc.] and various Plaintiffs in this
matter." (Exhibits to Plaintiffs' Memorandum, Affidavits of Ernest
F. Watts and William W. Roche, at 1-2.) First of all, these
statements miss the point; they address Sames's assets at the time
the Executive Contracts were executed, not at the relevant time--
when the Purchase Agreement was executed. More importantly, these
statements are self-serving and conclusory and do not have further
support in the record; therefore, they cannot create a triable
issue of fact. <u>See</u> <u>Hall v. Bodine Elec. Co.</u>, 276 F.3d 345, 354
(7th Cir. 2002).

The October Letter to Binks Sames shareholders described the
September 1998 sale of assets to ITW. The letter stated that "[a]s

you are probably aware, Binks Sames announced on August 31, 1998 that it was selling to [ITW] most of the assets and standard product lines of the traditional Binks business." (Exhibit to Plaintiffs' Reply, October Letter, at 1.) The letter summarized what Binks Sames sold to ITW:

> Essentially, the sale consisted of Binks standard products line, meaning the conventional spray guns, pumps, tanks, delivery systems, filters, coatings, safety equipment and various accessories. Included in the sale are all assets related to the manufacture and distribution of standard products in the U.S., including a manufacturing plant in Longmont, Colorado; the Poly-Craft Systems division in Oregon; the R&D facility in Boulder and domestic branches and warehouses. International operations included in the sale are the Binks Sames businesses in the U.K., Belgium, Germany, Australia and a portion of the Canadian operation. The businesses sold represented a little less than half of Binks Sames sales. The combined revenues accounted for 49.6 percent, or $55.6 million, of the $112 million in sales for the first six months of fiscal 1998.
> Going forward, this means that the new Binks Sames--which will be renamed Sames Corporation--will consist of the Sames S.A. business in Grenoble, France; Sames Electrostatic Inc. in Livonia, Michigan; Binks Sames Japan; Binks Sames Sweden and the North American Spray Booth Business.

(Id. at 1-2.) Plaintiffs argue that, because ITW bought the "traditional Binks business" or the "Binks Product Line," which included the Executive Contracts, ITW is a successor to those contracts.

Plaintiffs point to various provisions of the Purchase Agreement to support their argument. Regarding employees, the Purchase Agreement stated: "Effective as of the Closing Date, all employees of the Binks Business as listed in Schedule 6.9.1 will be

offered employment by [ITW] as of the Closing Date and those individuals who accept employment with [ITW] shall become employees of [ITW] . . . ." (Defendant's Memorandum, Ex. 3, Exhibit B to Affidavit of James H. Wooten, Jr., Purchase Agreement, ¶ 6.9.1.) Plaintiffs also point to the Purchase Agreement's provisions for the sale of customer contracts (¶ 3.12.1) and the sale of all Binks Business-related patents and trademarks (¶ 1.2.7). Moreover, plaintiffs contend that "ITW held the Binks Business in the predecessors name and continue [sic] to operate in that manner" and that ITW's "spray business unit does not commercially present itself as ITW, but rather as Binks," (Plaintiffs' Reply at 9-10), but provide no evidentiary support for either of these arguments.

ITW's evidence on the issue of successor liability consists of the affidavits of (1) Guy E. Snyder, a partner at the law firm of Vedder, Price, Kaufman & Kammholz who was in charge of Binks Sames's legal work in connection with the Purchase Agreement; and (2) James H. Wooten, Jr., ITW's Associate General Counsel and Assistant Secretary, who was the chief ITW attorney with respect to the Purchase Agreement. Snyder states that "[n]one of the Sames shareholders became shareholders of ITW as a result of the [Purchase Agreement] transaction." (Defendant's Memorandum, Ex. 2, Affidavit of Guy E. Snyder, ¶ 4.) Snyder's affidavit contains a list of Binks Sames's officers and directors immediately prior to

the execution of the Purchase Agreement.[3]  Snyder also states that "Sames sold only a portion of and not all of the assets to ITW" (id., ¶ 9) and that after the transaction, "Sames continued to maintain its own separate corporate existence and identity, and was managed by officers and directors completely separate from ITW's officers and directors" (id., ¶ 11).

Wooten states that "[n]o person formerly employed by Sames became a director or corporate officer of ITW after the [execution] of the Purchase Agreement."  (Defendant's Memorandum, Ex. 3, Affidavit of James H. Wooten, Jr., ¶ 3.)[4]  Wooten also states that after the transaction, ITW's principal place of business remained in Glenview, Illinois; no ITW shares were exchanged with Sames shareholders in connection with the transaction; and ITW did not acquire any of Sames's common stock.  (Id., ¶ 8.)

The parties frame the analysis differently.  ITW characterizes it as a comparison between Sames and ITW.  Plaintiffs frame the analysis as a comparison between the Binks Business (which constituted nearly half of Sames's business) and ITW.  We agree with plaintiffs that the focus should be on the line of business that was sold, regardless of corporate form and regardless of the disclaimer of liability for the Executive Contracts in the Purchase

---

[3] The affidavit does not, however, identify who Binks Sames's officers and directors were after the execution of the Purchase Agreement.

[4] Like Snyder's affidavit, Wooten's affidavit does not contain "before and after" lists of ITW's and Binks Sames's officers and directors for comparison.

Agreement. The Executive Contracts were part of the traditional Binks Business. Therefore, we will examine the Binks Business and whether ITW continued, without interruption or substantial change, the operations of the Binks Business.

The evidence submitted precludes summary judgment <u>against</u> either party, but is insufficient to enter summary judgment <u>for</u> either party. It is undisputed that ITW acquired "substantial assets" of Sames. But the evidence submitted by the parties does not tell us enough about what actually happened after the Purchase Agreement was executed to permit us to fully analyze whether ITW continued the operations of the Binks Business "without interruption or substantial change." We know that the Purchase Agreement provided for ITW's hiring of former Sames employees, but we do not know how many or what percentage of former Sames employees became employees of ITW or whether these employees performed the same jobs, in the same working conditions, for the same supervisors. There is no evidence regarding the production processes or facilities, or whether ITW made the same products or sold to the same body of customers. Additional (absent) relevant evidence would address whether there was a stock transfer involving a type of stock other than common stock, and the exact makeup of the companies' officers and directors before and after the sale. Despite plaintiffs' contention that ITW held itself out as a continuation of Sames, there is no evidence regarding this factor

either. Granting either party's motion would therefore be unwarranted. We should add that, given the evidence that <u>was</u> presented by the parties, we strongly suspect that any additional evidence would demonstrate that one or more genuine issues of material fact would exist, precluding summary judgment for either party.

C.   <u>Unilateral Contract Doctrine</u>

Plaintiffs contend that the "successors and assigns" clause of the Executive Contracts makes ITW liable under the Contracts. The clause provides that, "[i]f [Binks Manufacturing Company] shall at any time be merged or consolidated with any other corporation or if substantially all of the assets of the Company are transferred to another corporation," the Executive Contracts "shall be binding upon and inure to the benefit of the successor corporation." (Defendant's Memorandum, Ex. 1, Exhibit to Amended Complaint, Executive Contract of Richard T. Brend, at 6.) According to plaintiffs, the Executive Contracts are unilateral contracts which they performed; "ITW sought and obtained the benefit of the Contracts" and is thus bound as a successor. (Plaintiffs' Memorandum at 8-9.)

We believe that the principles of successor liability, discussed <u>supra</u>, rather than the language of the Executive Contracts, govern the issue of ITW's liability for the Executive Contracts. <u>See, e.g.</u>, <u>Moriarty</u>, 164 F.3d at 328-29 (federal common

law of successor liability applies to ERISA claims). Plaintiffs have cited no authority to the contrary.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are denied.


DATE:     July 9, 2002


ENTER:     _____

John F. Grady, United States District Judge